*This opinion is subject to revision before final publication in the Pacific Reporter*

**2014 UT 47**

IN THE

### SUPREME COURT OF THE STATE OF UTAH

SALT LAKE CITY
*Respondent,*

*v.*

WADE JOHN MILES,
*Petitioner.*

No. 20130475
Filed October 24, 2014

On Certiorari to the Utah Court of Appeals

Third District, Salt Lake
The Honorable Robert P. Faust
No. 111907362

Attorneys:

Scott A. Fisher, Padma Veeru-Collings,
Salt Lake City, for respondent

Joan C. Watt, Allyson Barker, Salt Lake City,
for petitioner

JUSTICE DURHAM authored the opinion of the Court, in which
ASSOCIATE CHIEF JUSTICE NEHRING, and JUSTICE PARRISH joined.

JUSTICE LEE filed a dissent, in which
CHIEF JUSTICE DURRANT joined.

JUSTICE DURHAM, opinion of the Court:

### INTRODUCTION

¶1   Wade John Miles was convicted under Utah Code section 76-10-503 (2011)[1] for having a pocketknife among his personal

---

[1]   This statute has been substantially amended since Mr. Miles's conviction. *See* 2014 Utah Laws 2255–58(amending, among other provisions, UTAH CODE §§ 76-10-501, -503). Our analysis, however, is governed by the 2011 version of the statute because the 2011 version was in place at the time of Mr. Miles's alleged criminal conduct. *See State v. Clark*, 2011 UT 23, ¶ 14, 251 P.3d 829 (noting that a party's "primary rights and duties are dictated by the law in effect at the time of . . . the conduct giving rise to a criminal charge"). We

(continued...)

belongings, which he carried with him in a shopping cart. Section 76-10-503 of the Utah Code criminalizes, among other things, possession of a "dangerous weapon" by a restricted person. The term "dangerous weapon," in turn, is defined in subsection 76-10-501(6). Mr. Miles appealed his conviction, arguing that his pocketknife did not qualify as a dangerous weapon under that statutory definition. He first argued that the statute permits consideration only of a knife's actual use, not its intended use. He then argued that because Salt Lake City failed to proffer evidence that the knife was actually used, the evidence presented at trial was insufficient to establish that his knife was a "dangerous weapon." The court of appeals rejected Mr. Miles's interpretation of the statute and held that an object's intended use may always be considered in determining whether the object is a "dangerous weapon" as defined by statute. *Salt Lake City v. Miles*, 2013 UT App 77, ¶ 13, 299 P.3d 1163. Under this reading, the court held that the evidence presented at trial, including, importantly, Mr. Miles's verbal threats to kill someone with a knife, was sufficient to establish that the knife in Mr. Miles's shopping cart was a dangerous weapon. *Id.* ¶ 19.

¶2 We granted certiorari to determine two issues: first, whether the court of appeals correctly interpreted the statutory definition of "dangerous weapon" in subsection 76-10-501(6); and second, whether the jury had sufficient evidence to reasonably conclude that Mr. Miles's knife qualified as a "dangerous weapon" under that statute. We disagree with the court of appeals that the statute permits consideration of an item's intended use if the item is "a knife, or another item . . . not commonly known as a dangerous weapon." UTAH CODE § 76-10-501(6)(b). For those objects, we hold that the statute permits consideration only of how the object was *actually* used, as outlined by the factors in subsection 76-10-501(6)(b). Based upon this interpretation of the statute, we hold that the evidence presented at trial was insufficient to establish that the pocketknife lying in Mr. Miles's shopping cart was a dangerous weapon as defined by statute.

## BACKGROUND

¶3 On the evening of October 4, 2011, Mr. Miles, who was homeless, attempted to board a light rail train in downtown Salt Lake City. The train operator prevented Mr. Miles from entering the train because Mr. Miles was attempting to board with a shopping cart containing his personal possessions. The train operator also

---

[1] (...continued)
accordingly reference the 2011 version throughout this opinion.

believed Mr. Miles was intoxicated, so he radioed for assistance from the field supervisor on patrol that night. The supervisor arrived soon thereafter and found Mr. Miles sitting on a decorative rock on the train platform. Mr. Miles's shopping cart was located beside him. The supervisor asked Mr. Miles to move with him to the sidewalk for safety reasons, but Mr. Miles refused and became "vulgar and belligerent" toward the supervisor. The supervisor then informed Mr. Miles that if he did not calm down, the supervisor would need to call the police for help in removing Mr. Miles from the platform. In response, Mr. Miles, still sitting on the rock, made a statement about a knife and a gun, which was the subject of some conflicting evidence at trial. Shortly after the incident, the supervisor wrote in his witness statement that Mr. Miles said "if" he had a gun or a knife he would "shoot and kill" the supervisor if the supervisor did not get away from Mr. Miles. At trial, however, the supervisor testified that Mr. Miles said he did have a knife and a gun and that—here the supervisor couldn't recall, but he believed—Mr. Miles said he would either stab or shoot him.

¶4     A police officer arrived a few minutes later and handcuffed Mr. Miles as a safety precaution. The officer asked Mr. Miles if he had a weapon, and Mr. Miles replied that he did not. At this point the officer "felt that [Mr. Miles] gave [him] a straight answer," so he proceeded to administer a field sobriety test, which Mr. Miles failed. Based upon the officer's observations to this point, he arrested Mr. Miles for intoxication, threatening the supervisor, and trespass.

¶5     The officer next conducted a search incident to arrest. After finding "nothing of any significance" on Mr. Miles's person, the officer searched Mr. Miles's shopping cart. There, the officer found a folding pocketknife inside the left breast pocket of one of Mr. Miles's jackets. Mr. Miles was not wearing the jacket during the incident on the train platform. When the officer inquired about the knife, Mr. Miles said he forgot he had it, but that he had purchased the knife for a dollar at Wal-Mart and used it for camping. The knife's blade is approximately three-and-a-half inches long and has a one-inch serrated portion next to the handle. The blade also features a thumb stud, which allows the user to rotate the blade open with one hand. Once rotated open, the blade locks back into a position parallel with the handle to prevent the blade from swinging closed on the user's fingers. To close the blade from this locked position, the user must press the "safety switch" located along the top edge of the knife handle. At trial, the police officer testified that the knife was capable of causing "exaggerated" wounds, permanent disfigurement, or death, if used as a weapon. The officer agreed,

however, that the "knife wouldn't inflict injury unless a person was intending to use it [as a weapon]." Moreover, the officer stated that the knife could be used as a tool for a variety of lawful purposes.

¶6    Salt Lake City ultimately charged Mr. Miles with four crimes: (1) criminal trespass; (2) threats against life or property; (3) intoxication; and (4) purchase, transfer, possession, or use of a dangerous weapon by a restricted person.[2] The jury acquitted Mr. Miles of the first three charges but convicted him of the fourth—possession of a dangerous weapon by a restricted person. Mr. Miles timely appealed to the Utah Court of Appeals, claiming the evidence presented at trial was "insufficient to establish that the knife he possessed on the train platform was a dangerous weapon as defined by statute." *Salt Lake City v. Miles*, 2013 UT App 77, ¶ 9, 299 P.3d 1163. Over Judge Davis's dissent, a majority of the court affirmed Mr. Miles's conviction. *Id.* ¶ 21.

¶7    The court first addressed the parties' disagreement over how to interpret the statute defining "dangerous weapon." Utah Code § 76-10-501(6). That statute begins in subsection 76-10-501(6)(a) by stating that the term "dangerous weapon" means "an item that in the manner of its use or intended use is capable of causing death or serious bodily injury." However, the statute's next subsection—subsection 501(6)(b)—sets out four factors that must be used to determine whether a knife, specifically, is a dangerous weapon:

> The following factors shall be used in determining whether a knife, or another item, object, or thing not commonly known as a dangerous weapon is a dangerous weapon:
>
> (i) the character of the instrument, object, or thing;
>
> (ii) the character of the wound produced, if any;
>
> (iii) the manner in which the instrument, object, or thing was used; and
>
> (iv) the other lawful purposes for which the instrument, object, or thing may be used.

*Id.* § 76-10-501(6)(b) (2011).

---

[2] Evidence presented at trial demonstrated that Mr. Miles was a Category II restricted person due to a prior felony conviction. *See* Utah Code § 76-10-503(1)(b)(i).

¶8   Mr. Miles essentially argued that the four factors in subsection 501(6)(b) are the only relevant considerations in deeming a knife to be a dangerous weapon. *See Miles*, 2013 UT App 77, ¶ 12. He therefore argued that since the second and third factors either implicitly or explicitly require actual use of the knife, "a person is guilty of possessing a dangerous weapon only if he in fact uses it." *Id.* He asserted this conclusion followed logically from the inclusion of "a knife" in subsection (b) as an item "not commonly known as a dangerous weapon." UTAH CODE § 76-10-501(6)(b) (2011). The court of appeals, however, held this interpretation to be out of harmony with related statutory provisions. *Miles*, 2013 UT App 77, ¶¶ 13–15. First, the court concluded that Mr. Miles's proposed interpretation of subsection 501(6)(b) did not accord with the language of its companion subsection 501(6)(a), which references an object's "intended use." *Id.* ¶ 13. This reference to intended use "clearly signal[ed]" to the court of appeals that "an item may qualify as a dangerous weapon even if it is not actually used as one." *Id.* Second, the court pointed out that adopting Mr. Miles's interpretation requiring actual use would nullify the "possession" variant of the criminal offense in section 76-10-503, which forbids not only use, but also purchase, transfer, *possession*, custody, or control of a dangerous weapon by a restricted person. *Id.* ¶ 14. Accordingly, the court held that a knife or other object not commonly known as a dangerous weapon need not "actually be used" to qualify as a dangerous weapon under the statute. *Id.* ¶ 15.

¶9   The court next addressed, in light of its interpretation of the statute, whether Salt Lake City presented sufficient evidence from which the jury could reasonably conclude that Mr. Miles's knife was a dangerous weapon. *Id.* ¶¶ 16–20. After analyzing the available evidence on each of the four factors, and viewing that evidence in a light most favorable to the jury's verdict, the court held that "reasonable minds could . . . have reached the conclusion that [Mr.] Miles's knife was a dangerous weapon" and affirmed the verdict. *Id.* ¶ 21 (internal quotation marks omitted). In doing so, the court relied heavily on Mr. Miles's alleged threats as evidence that Mr. Miles intended to use the knife as a dangerous weapon. *Id.* We granted certiorari to determine whether the court of appeals erred in holding there was sufficient evidence to support Mr. Miles's conviction for possession of a dangerous weapon as defined in subsection 501(6).

## STANDARD OF REVIEW

¶10 On certiorari, "we review the decision of the court of appeals and not that of the district court." *State v. Hansen*, 2002 UT 125, ¶ 25, 63 P.3d 650 (internal quotation marks omitted). The court of appeals' decision interprets Utah Code section 76-10-501(6) and evaluates the sufficiency of the evidence supporting Mr. Miles's conviction. We review the court of appeals' statutory interpretation for correctness, giving no deference to its legal conclusions. *Stephens v. Bonneville Travel, Inc.*, 935 P.2d 518, 519 (Utah 1997). Whether the evidence presented at trial is sufficient to support the verdict is likewise a question of law, which we review for correctness. In reviewing the sufficiency of evidence, however, we "do[] not sit as a second fact finder." *State v. Warden*, 813 P.2d 1146, 1150 (Utah 1991). Instead, our review "is limited to insuring that there is sufficient competent evidence regarding each element of the charge to enable a jury to find, beyond a reasonable doubt, that the defendant committed the crime." *Id.* This review requires the evidence and all reasonable inferences that may be drawn therefrom to be viewed "in the light most favorable to the jury verdict." *Id.* Because a sufficiency of the evidence inquiry ends "if there is some evidence . . . from which findings of all the requisite elements of the crime can reasonably be made," *State v. Butt*, 2012 UT 34, ¶ 24, 284 P.3d 605 (internal quotation marks omitted), we will overturn a conviction only if the evidence "is so inconclusive or inherently improbable that a jury must have entertained a reasonable doubt as to the defendant's guilt." *Warden*, 813 P.2d at 1150.

## ANALYSIS

¶11 Mr. Miles contends that the court of appeals erred both in interpreting and applying section 76-10-501(6) of the Utah Code, which defines "dangerous weapon" as used in the statute under which Mr. Miles was convicted. We first address Mr. Miles's statutory interpretation arguments. We then turn to whether the court of appeals erred in concluding that the evidence was sufficient to support the jury's verdict.

### I. THE FACTORS IN SUBSECTION 76-10-501(6)(b) ARE THE EXCLUSIVE DEFINITIONAL CONSIDERATIONS FOR KNIVES OR OTHER ITEMS NOT COMMONLY KNOWN AS DANGEROUS WEAPONS

¶12 Mr. Miles argues that the court of appeals incorrectly construed the statute to permit a jury to consider a knife's intended use in making the dangerous weapon determination. The court of appeals held that a knife's intended use may be considered because

subsection 501(6)(a) references "intended use" in defining the term dangerous weapon. UTAH CODE § 76-10-501(6)(a) (2011). Mr. Miles, however, argues that when the item in question is a "knife, or another item . . . not commonly known as a dangerous weapon," *id.* § 76-10-501(6)(b) (2011), the only considerations relevant to that determination are the four factors enumerated in subsection 501(6)(b). And because those factors speak only in terms of a knife's *actual* use,[3] Mr. Miles argues evidence of the knife's *intended* use may not support a verdict that the knife was a dangerous weapon.

¶13 When interpreting a statute, "we look first to the statute's plain language to determine its meaning." *Sindt v. Ret. Bd.*, 2007 UT 16, ¶ 8, 157 P.3d 797 (internal quotation marks omitted). "[T]he plain language of a statute is to be read as a whole, and its provisions interpreted in harmony with other provisions in the same statute and with other statutes under the same . . . chapter[]." *Duke v. Graham*, 2007 UT 31, ¶ 16, 158 P.3d 540 (alteration in original) (internal quotation marks omitted).

¶14 As noted, subsection 76-10-501(6) states that the term dangerous weapon "means an item that in the manner of its use or intended use is capable of causing death or serious bodily injury." If we were to read this sentence in isolation, we would agree with the court of appeals that its terms appear to apply to any item capable of causing death or serious bodily injury, whether that item is one that is commonly known as a dangerous weapon—like a grenade or sword—or one that is not—like a shovel, baseball bat, or screwdriver. The second subpart of this statute, however, qualifies this language by stating that "in determining whether a knife, or another item, object, or thing *not commonly known as a dangerous weapon* is a dangerous weapon," four enumerated factors "shall be used." UTAH CODE § 76-10-501(6)(b) (2011) (emphasis added). "Implicit in this second sentence are two separate categories: (1) items *commonly known* as dangerous weapons; and (2) items *not commonly known* as dangerous weapons but included if, in considering the . . . enunciated [factors], they qualify." *State v. Archambeau*, 820 P.2d 920, 929 (Utah Ct. App. 1991). When read together with subsection (a), the language of subsection (b) indicates that each subpart of this section provides a separate and comprehensive definitional standard applicable to these two

---

[3] UTAH CODE § 76-10-501(6)(b)(ii) (2011) ("the character of the wound produced, *if any*" (emphasis added)); *id.* § 76-10-501(6)(b)(iii) (2011) ("the manner in which the instrument, object, or thing *was used*" (emphasis added)).

separate categories of objects. Subsection (a) applies to, and categorically includes in its definition, those objects commonly known as dangerous weapons—i.e., those items that are designed, produced, and commonly used or intended to be used primarily to cause death or serious bodily injury. Subsection (b), on the other hand, provides a separate standard that applies to objects that are "not commonly known as . . . dangerous weapon[s]," specifically mentioning knives, and requires consideration of four enumerated factors in determining whether knives are dangerous weapons.

¶15 Stated concisely, if an item is commonly known as a dangerous weapon because it is generally understood to be an item whose "use or intended use" is the infliction of grave bodily injury or death, it qualifies as a dangerous weapon under subsection 501(6)(a); but if an item is "not commonly known as a dangerous weapon" because it is an object whose primary utility is something other than its capability to inflict serious bodily injury or death, the statute requires application of a four-factor test to determine if the item qualifies as a dangerous weapon.

¶16 This interpretation is supported by the structure of section 76-10-501(6) and its surrounding provisions. Although subsection (a) might appear at first blush to be a universally applicable definition of "dangerous weapon," we find this interpretation inconsistent with the structure of the statute. If subsection (a) were to apply, as the court of appeals held, to *any* object "that in the manner of its use or intended use is capable of causing death or serious bodily injury"—including items not commonly known as dangerous weapons—consideration of at least two of the four factors in subsection (b) would be unnecessary and duplicative. Indeed, consideration of the first factor—the instrument's character—would be duplicative of subsection (a)'s consideration of the object's "use or intended use," which, as described above, goes to the object's commonly understood nature as a dangerous weapon. And the fourth factor—the "other lawful purposes for which the instrument . . . may be used"—is simply the converse of subsection (a)'s consideration of whether the object's primary utility is its capability to inflict serious bodily injury or death. This significant redundancy suggests that the purpose of subsection (b) is not to list factors that merely inform subsection (a)'s definition, but rather to provide a separate and comprehensive set of definitional considerations applicable to items that do not fall within the ambit of subsection (a)—i.e., to knives and other items not commonly known as dangerous weapons.

¶17 Furthermore, we disagree with the court of appeals' suggestion that this interpretation of the statute would "nullify [the 'possession'] variant of the offense" in subsection 76-10-503(3).[4] *Salt Lake City v. Miles*, 2013 UT App 77, ¶ 14, 299 P.3d 1163. The court of appeals concluded that an interpretation that failed to consider an item's "intended use" under subsection (a), and instead focused exclusively on the four factors in subsection (b)—which speak only of the item's actual use—would read out of section 76-10-503(3) the crime of possessing a dangerous weapon. *See id.*

¶18 The interpretation we espouse today, however, does not categorically eliminate the possession variant of this offense because objects commonly known as dangerous weapons fall squarely within the statute's definition of dangerous weapon under subsection (a). Thus, for example, if a Category II restricted person possessed an item commonly known as a dangerous weapon (for instance, a grenade), that person could face prosecution under subsection 503(3) for possession of a dangerous weapon, as a grenade falls squarely within the definition of dangerous weapon under subsection 501(6)(a). It is only when the item in question is *not* commonly known as a dangerous weapon (for example, a knitting needle or a crowbar) that the focus shifts exclusively to the character of the instrument, the character of wounds it produced, if any, the manner in which it was used, and the other lawful uses for which it may be used. And under these factors, even in the absence of use, it still may be possible for such an item to exhibit such an abundance of weapon-like characteristics and be substantially devoid of other lawful uses, that it may appropriately be deemed a dangerous weapon, the possession of which would be unlawful under Utah Code section 76-10-503(3).

¶19 Finally, we note that for items not commonly known as dangerous weapons, the statutory shift in focus to these four factors, which emphasize the manner in which the object is *actually used*, is justified because such items are primarily intended to be used for purposes other than "causing death or serious bodily injury." UTAH CODE § 76-10-501(6)(a) (2011).[5] Thus, the intended use of these items

---

[4] UTAH CODE § 76-10-503(3) (2011) ("A Category II restricted person who purchases, transfers, possesses, uses, or has under his custody or control: . . . (b) any dangerous weapon other than a firearm is guilty of a class A misdemeanor.").

[5] It is perhaps true that an item not commonly known as a dangerous weapon may have multiple purposes, one of which might

(continued...)

does not establish their nature as a dangerous weapon. But an inquiry into how the item was *actually* used and the wound it *actually* produced, together with an analysis of the item's character, could demonstrate quite clearly its nature as a dangerous weapon.[6] Accordingly, "in determining whether a knife, or another item, object, or thing not commonly known as a dangerous weapon is a dangerous weapon," *id.* § 76-10-501(6)(b) (2011), evidence of the use to which the defendant intended to put the object is not to be considered by the fact finder.

## II. SALT LAKE CITY FAILED TO PROVIDE SUFFICIENT EVIDENCE UPON WHICH THE JURY COULD CONCLUDE THAT MR. MILES' KNIFE WAS A DANGEROUS WEAPON UNDER SECTION 76-10-501(6)

¶20 We now turn to the question of whether the evidence presented at trial is sufficient to sustain the jury's verdict that Mr. Miles's knife was a dangerous weapon under the statute. Having determined that the four factors in subsection 76-10-501(6)(b) are the exclusive considerations to be addressed when determining whether a "knife . . . is a dangerous weapon," we now examine the sufficiency of the evidence presented on each statutory factor in subsection 501(6)(b).

¶21 The first factor is "the character of the instrument, object, or thing." UTAH CODE § 76-10-501(6)(b)(i) (2011). In marshaling the record evidence supporting the jury's verdict on this factor, the court of appeals noted the following characteristics of the knife: its three-and-a-half inch blade, its handle of approximately the same length, the blade's serrated portion, and the thumb stud located on the blade for ease of deployment. *Salt Lake City v. Miles*, 2013 UT App 77, ¶ 17, 299 P.3d 1163. In summarizing the way in which this evidence supported the dangerous weapon determination, the court noted that the blade "could be flipped open with one hand and was capable of inflicting serious, even deadly, wounds." *Id.* ¶ 21. We hold, however, that this evidence cannot weigh in favor of the jury's

---

[5] (...continued) arguably be to cause death or serious bodily injury. But this fact only underscores the point that "intended use" is inapposite, and therefore the determinative consideration regarding this item's use is not its *intended* use (for there may be several), but the way in which it was *actually* used.

[6] Examples abound: a baseball bat, a candlestick, a metal pipe, a ballpoint pen, etc.

verdict because these facts simply recite general characteristics common to many, if not most, pocketknives; and knives—under the statute—are *explicitly* listed as items "*not* commonly known as . . . dangerous weapon[s]." *See* UTAH CODE § 76-10-501(6)(b) (2011) (emphasis added).

¶22 This first statutory factor does not call upon the jury to consider the general characteristics of the knife in a vacuum, but rather to consider the *character* of the knife *as a dangerous weapon*. "Character" is defined, in relation to an object's characteristics, as the "individual composite of salient traits, consequential characteristics, [and] features giving distinctive tone." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 376 (2002). It is similarly defined as the "essentials of structure, form, materials, or function that together make up and usu[ally] distinguish" the object in question from one of a different category. *Id.* The purpose of this statutory factor is to distinguish ordinary knives, those not commonly known as dangerous weapons, from knives that are in fact dangerous weapons. Therefore, when assessing the "character" of the knife, the focus is on the knife's "individual composite of salient traits, consequential characteristics, [and] features giving [the knife the] distinctive tone" *of a dangerous weapon*. For a knife's characteristics to weigh in favor of Salt Lake City under this factor, they must be those that go beyond attributes common to knives that make them useful as tools, e.g., their sharpness, cutting ability, or safety mechanisms; they must be features that help to distinguish the knife in question from the presumptive category of common, tool-like knives and demonstrate a character consistent with the statutory category of dangerous weapons.

¶23 None of the general characteristics recited by the court of appeals, individually or in the aggregate, give Mr. Miles's knife the distinctive tone of a dangerous weapon. The knife's three-and-a-half inch blade is nothing out of the ordinary for common utility knives; in fact, a blade much shorter than that would have substantially limited utility. And the presence of a small serrated portion on the blade is also not an inherent marker of a dangerous weapon. Indeed, average steak knives feature a blade of at least that length and a fully serrated blade. These features alone do not give a knife the "distinctive tone" of a dangerous weapon.

¶24 The thumb stud on the knife's blade likewise does not distinguish this pocketknife as a dangerous weapon. Salt Lake City argues the thumb stud is inherently weapon-like because it allows the user to open the knife with one hand in the event the user wishes

to deploy it as a weapon. But the thumb stud offers the same convenience if the user wishes to deploy the blade as a tool. Accordingly, this feature is at best ambiguous, and is certainly not an inherently distinctive feature of knives that are dangerous weapons. We therefore hold that the evidence considered by the court of appeals and available to the jury on this factor cannot, as a matter of law, weigh in favor of categorizing Mr. Miles's knife as a dangerous weapon.

¶25 The second factor is "the character of the wound produced, *if any*." UTAH CODE § 76-10-501(6)(b)(ii) (2011) (emphasis added). Only those wounds actually produced by the knife may be appropriately considered under this factor. The court of appeals acknowledged that "no wound was in fact produced" in this case. *Miles*, 2013 UT App 77, ¶ 18. That should have been the end of the court's analysis. But the court went on to consider the officer's testimony of the wounds the knife could inflict if it were used as a weapon, including causing "puncture and slashing wounds," an exaggerated wound profile due to the serrated edge, and infliction of "permanent disfigurement or even death." *Id.* This was error. Evidence presented under this factor is relevant only if it is evidence of wounds actually produced by the knife in question. Because Mr. Miles's knife inflicted no wounds, this factor must weigh against a finding that the knife was a dangerous weapon.

¶26 The third factor is "the manner in which the instrument, object, or thing *was used*." UTAH CODE § 76-10-501(6)(b)(iii) (2011) (emphasis added). Just like the second factor, this one is applicable only when the knife is *actually* used. Once again, the court of appeals acknowledged that Mr. Miles "did not physically use the knife." *Miles*, 2013 UT App 77, ¶ 19. Yet the court continued its analysis of this factor, considering evidence that the knife was "within reach in the pocket of [Mr. Miles's] jacket in a nearby shopping cart," and that Mr. Miles had "framed" the knife as a weapon by threatening the supervisor. *Id.* This, too, was error. The jury may consider evidence under this factor only if it demonstrates the manner in which the knife "*was used*." UTAH CODE § 76-10-501(6)(b)(iii) (emphasis added). Physical use is the touchstone of this factor's analysis. We therefore reject the court of appeals' implication that Mr. Miles "used" the knife by "framing" it as a weapon with his threats. Even assuming Mr. Miles was referencing *this* knife in making his threats, a verbal reference to an object does not constitute "use" of that object under this statutory factor. The court of appeals therefore erred in its analysis of this factor by considering evidence

that had no bearing on how the knife was actually used. Indeed, as the court of appeals stated, the knife here was not used at all.

¶27 Finally, the fourth factor is "the other lawful purposes for which the instrument, object, or thing *may* be used." UTAH CODE § 76-10-501(6)(b)(iv) (2011) (emphasis added). The statute's use of the word "may" in this factor indicates that evidence presented on this point need only demonstrate that the knife is *capable* of lawful uses. The court of appeals noted the evidence presented on this factor, specifically Mr. Miles's statement that he used the knife for camping. *Miles*, 2013 UT App 77, ¶ 20. The court agreed that the knife is "obviously well suited for camping and other innocent uses" as demonstrated by the officer's testimony at trial. *Id.* All of the evidence presented on this factor clearly weighed against a determination that Mr. Miles's knife was a dangerous weapon.

¶28 After review of the evidence presented under each of the four enumerated factors in section 76-10-501(6)(b), we conclude that none of the evidence supports Salt Lake City's position that Mr. Miles's knife is a dangerous weapon under the statute. The evidence presented on the first factor did not demonstrate, nor did it give rise to a reasonable inference, that Mr. Miles's knife bore the character of a dangerous weapon as evidenced by any inherent and uniquely weapon-like traits. Additionally, because Mr. Miles's knife was not used and did not produce any wounds, Salt Lake City necessarily failed to present the jury with evidence supporting its position on the second and third factors. And finally, the evidence presented on the fourth factor—the knife's other lawful uses—clearly weighed in favor of Mr. Miles. Accordingly, we conclude that the evidence presented at trial was insufficient to sustain Mr. Miles's conviction of possession of a dangerous weapon as defined in section 76-10-501(6).

¶29 We therefore reverse the court of appeals and vacate Mr. Miles's conviction.

JUSTICE LEE, dissenting:

¶30 The operative statutory provisions criminalize a restricted person's "possession" of "an item that in the manner of its use *or intended use* is capable of causing death or serious bodily injury." UTAH CODE § 76-10-503 & 501(6)(a) (2011) (emphasis added). These provisions seem clearly to extend to the possession of a knife by a person who *openly threatens* his *intended use* of causing death or serious bodily injury. And in this case the evidence of such intent was clear and straightforward.

¶31  The jury heard testimony from the field supervisor on duty that Wade Miles said he had a knife or gun and would "shoot and kill" the supervisor if he would not leave him alone. *See supra* ¶ 3. That was no idle threat, as Miles in fact did have a knife within reach. I would affirm the verdict on the basis of that evidence and in light of the controlling statutory definition, which encompasses *all items* with an "intended use" of "causing death or serious bodily injury." UTAH CODE § 75-10 – 501(6)(a).

¶32  The majority reaches a contrary conclusion. It does so based on the view that the statute prescribes two separate definitions of "dangerous weapon" — one (in subsection (a) of Utah Code section 501(6)) for objects *commonly known as* dangerous weapons, and another (in subsection (b) of that same provision) for objects *not* so known. *Supra* ¶¶ 14–18. And because a knife like the one in question here is not "commonly known" as a dangerous weapon, the court discards the first definition in favor of the second, concluding that the "language of subsection (b) indicates that each subpart of this section provides a separate and comprehensive definitional standard applicable to" knives and other objects not commonly known as dangerous weapons. *Supra* ¶ 14. Finally, the court finds no evidence to sustain a determination of Miles's knife as a "dangerous weapon" under subsection (b), and therefore reverses the conviction entered in this case for lack of sufficient evidence. *Supra* ¶ 28.

¶33  I respectfully dissent. I find no basis on the face of the statute for the majority's notion of *two definitions* of "dangerous weapon." Only subsection (a) of 501(6) speaks the language of *definition*. It does so in unmistakably definitional terms — starting with the statutory term in quotes and then expressly stating what it "means." UTAH CODE § 76-10-501(6)(a) ("'Dangerous weapon' means an item that in the manner of its use or intended use is capable of causing death or serious bodily injury."). No other definitional language appears in the statute. So subsection (a) represents the sum and substance of the statutory notion of "dangerous weapon." And that definition says nothing of subclasses of weapons — of those commonly known or not commonly known as weapons. Instead it comprehensively defines "[d]angerous weapon" to mean *each and every* "item that in the manner of its use or intended use is capable of causing death or serious bodily injury." *Id.*

¶34  I dissent from the majority's approach because it overrides a clear component of this definition — eliminating any possibility of a knife (or other item not *commonly known* as a dangerous weapon from) qualifying as such (absent actual use) *even if* its expressly

threatened "intended use" is to inflict "death or serious bodily injury." That conclusion cannot be reconciled with the statutory definition. We cannot eliminate a subclass of items whose *openly threatened* "intended use" is to inflict death or serious bodily injury without contravening the terms of the statute.

¶35 Subsection (b) of section 501(6) is subordinate to, not coextensive with, subsection (a). Because some objects used or intended to be used to inflict injury are not *always* understood as "dangerous weapons," subsection (b) prescribes certain "factors" to guide the factfinder's application of the subsection (a) definition. Yet *factors* are not definitional. They simply identify categories of evidence of relevance to the legal construct in question. Black's Law Dictionary 671 (9th ed. 2009) (defining "factor" as "an agent or cause that *contributes* to a particular result") (emphasis added)). Definitions are a distinct concept. They establish "a general rule," or set a "boundary." *Id.* at 488 (defining "*definitio,*" latin root of definition).

¶36 Only subsection (a) fits the latter mold. Only that provision establishes the general rule or boundary that marks the legislative understanding of "dangerous weapon." It does so by clearly stating what "'[d]angerous weapon' means" — "an item" (without qualification, and without limitation to items "commonly known" as dangerous weapons) "that in the manner of its use or intended use is capable of causing death or serious bodily injury." Utah Code § 76-10-501(6)(a).

¶37 Thus, subsection (b) is not definitional. It is a list of "factors" of relevance to the factfinder's application of the broader statutory definition in subsection (a). And it does not endorse the majority's notion of knives and similar weapons as escaping the element of mere "intended use."

¶38 The factors listed in subsection (b) do not support the majority's inference of a "separate and comprehensive definitional standard" for knives and other such objects. *Supra* ¶ 14. The majority so concludes on the basis of the overlap between subsection (a)'s notion of "intended use" and the first and fourth factors prescribed in subsection (b). *Supra* ¶ 16. But the cited overlap in no way renders the enumerated factors "unnecessary and duplicative" as extended to knives. *Id.* Overlap, in fact, is inherent in the nature of a statutory *factor*. The whole point of identifying "factors" of relevance to a statutory definition is to elaborate and expand upon the definitional terms. So the fact that consideration of an object's "character" overlaps with the definition's reference to an object's "use or

intended use" is not a reason to view the factors as overtaking the definition. *Supra* ¶ 16 (so concluding). That only reinforces the apparent purpose of the factors—of elaborating on the definition by identifying categories of relevant evidence.

¶39  The same goes for the fact that the fourth factor (the object's "other lawful purposes") is "the converse" of an object's intended use for bodily harm. *Id.* This is not a "significant definitional redundancy" indicating that subsection (b) prescribes its own subsidiary definition. *Id.* It is simply an elaboration of the single definition set forth in the statute—and in that sense a classic application of the notion of a legal *factor*.

¶40  In reversing Miles's conviction under its construction of the statute, the majority effectively eviscerates the crime of mere *possession* of dangerous weapons such as knives. Under the court's opinion as I understand it, a convicted felon cannot be convicted of unlawfully *possessing* a knife (or, presumably, an ice pick, box cutter, or chain saw) that he openly wields for the threatened purpose of inflicting serious bodily harm. So long as such weapon is not actually used to inflict a bodily wound, the law as stated in the majority opinion would foreclose a charge or conviction of possession of a dangerous weapon.

¶41  That conclusion follows from the court's determination of the insufficiency of the evidence to sustain Miles's conviction. The majority emphasizes that under its reading the "focus" of the statutory definition for knives is on "the manner in which the object is *actually used.*" *Supra* ¶ 19. And it specifically holds that mere "intended use" of a knife or other object not commonly known as a dangerous weapon cannot "establish [its] nature as a dangerous weapon." *Id.*; *see also supra* ¶ 2 (explaining that for such objects "the statute permits consideration only of how the object was *actually* used"). Ultimately, from these premises, the court finds the evidence against Miles insufficient, as he never actually used the knife in question as a weapon but only threatened to do so, and the "character" of the knife in the court's view was insufficient to weigh in favor of its treatment as a "dangerous weapon." *Supra* ¶¶ 22–28.

¶42  I disagree with both the premises and application of the court's analysis. The court's premises confirm that it is eliminating the crime of possession of knives and other such weapons. If "intended use" cannot suffice to establish the dangerous nature of a knife or other such weapon, then there is no crime of mere

possession for such objects.[1] Perhaps there is a reasonable public policy basis for that decision.[2] But there is no room for it in our statutory scheme, and I dissent from the court's decision on that ground.

¶43 I also disagree with the court's determination of the insufficiency of the evidence. First, I would treat the factors in subsection (b) for their stated purpose—as factors—and not as a separate definition or operative test. So I would judge the sufficiency of the evidence primarily under the definition in subsection (a), and only secondarily as informed by the factors in subsection (b). And under the statutory definition, I would find ample evidence to support the jury's determination that Miles's knife was "an item that in the manner of its . . . intended use is capable of causing death or serious bodily injury." UTAH CODE § 76-10-501(6)(a). The principal relevant evidence was glaringly probative. It took the form of Miles's explicit *threat* to use his knife to kill or cause serious bodily injury. That is about as clear a case of "intended use" as you could ever find, which is why the court's decision to reverse amounts to a

---

[1] The court's disclaimer only reinforces the problem. Certainly the decision preserves the crime of mere possession for "objects commonly known as dangerous weapons." *Supra* ¶ 18. But there is no separate crime of *possession of objects commonly known as dangerous weapons*. The statutory crime is possession of a dangerous weapon, and the operative definition unmistakably encompasses all objects with the intended purpose of inflicting serious injury. So the notion that we are preserving the crime of possession for *some* dangerous weapons is a concession that we are eliminating it for others. Thus, after today's decision, restricted persons in Utah may openly brandish and threaten the use of knives, ice picks, box cutters, and the like, without fear of prosecution for possession of a dangerous weapon. I dissent because I see no way to reconcile that with a statute that plainly criminalizes the possession of all objects whose "intended use" is to inflict serious injury.

[2] I can appreciate, for example, the concern that restricted persons deserve notice of the objects that they are criminally prohibited from possessing; the view that it is difficult to define precisely the considerations relevant to "intended use" of knives and other objects with lawful uses; and the need to balance the interest of restricted persons to own and carry such items. But these are policy questions for the legislature. So long as our statute criminalizes the mere possession of objects whose "intended use" is to cause death or serious bodily injury, we must respect that decision.

decision to eliminate the crime of possession for knives or similar objects.

¶44 The fact that a "threat" to use the object to cause harm is not listed in subsection (b) is no barrier to this conclusion. Nor is the mandatory "shall" nature of the statutory listing. Again, factors, by nature, are categories of evidence of relevance to fact-intensive determinations. An actual *threat* could easily be understood to be left off of the list on the ground that *that* is a clear-cut case of *intended use* to harm. And that is the ultimate statutory question; the factors are secondary (even if required to be considered). We cannot ignore straightforward, patent evidence of intended use just because the statute tells us to consider other factors that would be helpful in more difficult cases.

¶45 Second, I also disagree with the notion that the factors in subsection (b) go only to an item's *actual use*. *Supra* ¶ 19. Clearly the "character" of an instrument and the "other lawful purposes for which [it] may be used" are about *potential use*. UTAH CODE § 76-10-501(6)(b)(i) & (iv). So at least half of the listed factors aren't at all about actual use. Plus, even the "manner" of use factor could encompass use *as a weapon* without any actual infliction of a wound — since weapons are also *used* as such to make threats. *See infra* ¶¶ 47—48.

¶46 There is accordingly no basis for conceiving of the subsection (b) factors as limited to actual use to inflict injury. Understandably. Consider an ice pick. Such an item was once a common kitchen implement. But that character went away long ago — when the ice box became the refrigerator. So its character today is often as a weapon.[3] And it lacks few if any "other lawful purposes." So if an ice pick were brandished by a felon with an express threat to use it to kill or cause serious harm, surely it would qualify as a dangerous weapon (even without evidence of "actual use" to inflict injury).

¶47 Finally, I would find the evidence in this case to be sufficient even if I saw a basis for treating subsection (b) as a freestanding definition. In short, I agree with the court of appeals majority's analysis of the statutory factors: the *character* of the knife

---

[3] Wendy Ruderman, *The Ice Pick Seems Antiquated, But It Still Shows Up Occasionally On the Police Blotter*, N.Y. TIMES, Sept. 1, 2012, at A19 (explaining that the introduction of the refrigerator rendered the ice pick largely irrelevant; noting that the ice pick's principal remaining purpose is as a weapon).

cuts at least arguably in favor of its assessment as a dangerous weapon in light of its thumb stud and serrated blade; the knife's capability of inflicting serious wounds is another factor weighing at least plausibly in the same direction; and Miles *used* the knife as a weapon by brazenly threatening to use it to "kill" the supervisor with it while the object was "within reach in the pocket of his jacket in a nearby shopping cart," thus "fram[ing] the knife as a weapon rather than a tool." *Salt Lake City v. Miles*, 2013 UT App 77, ¶ 19, 299 P.3d 1163.

¶48 The majority's responses are unpersuasive. It may well be that the thumb stud and serration do not give Miles's knife "the distinctive tone of a dangerous weapon," *supra* ¶ 23, but that only means that "character" is a factor that could cut either way. And on sufficiency of the evidence questions we defer to the jury, giving its verdict the benefit of any reasonable doubts. As to the second factor, I do not dispute that the statute speaks directly only to "wounds *actually produced* by the knife." *Supra* ¶ 25 (emphasis in original). But in the context of a crime of *possession* of an object *intended* to cause harm, it is reasonable to read "if any" to leave room for the jury to consider wounds potentially produced by the knife. And significantly, I cannot agree that the "use" referred to in the third factor refers exclusively to use *to inflict a wound. Supra* ¶ 26 (so concluding). Surely weapons are understood to do more than inflict wounds; they are also for deterrence—or for proactive threats of violence. So in my view Miles did actually *use* the knife *as a weapon*—to threaten the field supervisor with bodily harm. This is *not* a lawful, non-weapon use. He was hardly whittling by the campfire.

¶49 For these reasons, only one of the four subsection (b) factors ("other lawful purposes for which [it] may be used") clearly and exclusively weighs against the jury's verdict. I would hold that that is insufficient, and would therefore affirm even under the majority's understanding of the definitional nature of subsection (b).